**FIREMAN'S FUND INSURANCE COMPANY, et al., Plaintiffs,**

v.

**John GARAMENDI, Commissioner of Insurance of the State of California, Defendant.**

**Association of California Insurance Companies, Plaintiff-in-intervention.**

**UNITED STATES FIDELITY AND GUARANTY COMPANY, et al., Plaintiffs,**

v.

**John GARAMENDI, Commissioner of Insurance of the State of California, Defendant.**

Nos. C–91–2854–CAL, C–91–2855–CAL.

United States District Court, N.D. California.

April 13, 1992.

Terry J. Houlihan, David M. Balabanian, Christopher Van Gundy, McCutchen, Doyle, Brown & Enerson, San Francisco, Cal., Donald A. Newman, Thelen Marrin, Johnson & Bridges, Los Angeles, Cal., for plaintiffs-intervenors in No. C–91–2854–CAL.

Kent Keller, Barger & Wolen, J. Russell Stedman, Robert Hogeboom, Steven H.

Weinstein, Los Angeles, Cal., for plaintiffs in No. C–91–2855–CAL.

Michael Strumwasser, Susan L. Goodkin, Susan L. Durbin, Frederic D. Woocher, Strumwasser and Woocher, Santa Monica, Cal., for defendant.

## AMENDED OPINION AND JUDGMENT OF DISMISSAL

LEGGE, District Judge.

Plaintiffs Fireman's Fund Insurance Company ("Fireman's Fund"), United States Fidelity and Guaranty Company ("USF & G"), their affiliates, and plaintiff-in-intervention Association of California Insurance Companies ("ACIC") challenge the constitutionality of regulations enacted by the California Insurance Commissioner. Those regulations attempt to implement the insurance rate rollback provisions of Proposition 103, an initiative passed by California voters in 1988. Defendant John Garamendi, the Insurance Commissioner of California (the "Commissioner"), has moved to dismiss plaintiffs' claims as unripe, or alternatively to have this court abstain from exercising jurisdiction.

### I.

#### A.

On November 8, 1988 California voters adopted Proposition 103 ("Prop. 103"), an initiative on the subject of insurance and insurance premium rates. Prop. 103 required insurers in the following year to reduce their automobile and other property and casualty insurance premium rates to twenty percent below the rates in effect one year before the initiative was passed, unless the Insurance Commissioner found that an insurer was "substantially threatened with insolvency." Cal.Ins.Code § 1861.01(a), (b). After the first year, rates could be increased only with the prior approval of the Commissioner. Cal.Ins. Code § 1861.01(c). The initiative prohibits rates that are "excessive" or "inadequate." Cal.Ins.Code § 1861.05(a).

#### B.

The day after the initiative was passed, seven insurers and ACIC petitioned the California Supreme Court to declare the rate rollback and other provisions of Prop. 103 unconstitutional. In *Calfarm Ins. Co. v. Deukmejian*, 48 Cal.3d 805, 258 Cal. Rptr. 161, 771 P.2d 1247 (1989), that court invalidated the provision allowing only those insurers "threatened with insolvency" to avoid the rollbacks, since solvent insurers could not obtain relief from confiscatory rates during the rollback period. *Id.* 48 Cal.3d at 818–19, 258 Cal.Rptr. 161, 771 P.2d 1247. However, the court found the provision severable, and held that the general provision barring "inadequate" rates applied to rate regulation during the rollback period. *Id.* at 821–23, 258 Cal. Rptr. 161, 771 P.2d 1247. The court held that this met the constitutional requirement that insurers be allowed to earn a "fair and reasonable return," since a confiscatory rate was necessarily "inadequate" under the statute. *Id.* at 822–23, 258 Cal.Rptr. 161, 771 P.2d 1247.

The court otherwise upheld the rollbacks in Prop. 103, subject to the right of an insurer to apply to the Insurance Commissioner for approval of a higher rate, and to demonstrate that the rolled back rates were confiscatory as applied to it. *Id.* at 825–26, 258 Cal.Rptr. 161, 771 P.2d 1247. An insurer who filed such an application would be allowed to charge the higher rate pending the Commissioner's ruling on the application. If the Commissioner later determined that the rate mandated by the initiative, or some rate less than the insurer charged, was all that was constitutionally required, the insurer would have to refund the excess premiums collected with interest.

#### C.

In response to the *Calfarm* decision, 460 insurers filed 4,089 applications for exemption from the rollback requirements. Over the next year and a half, then Commissioner Roxani Gillespie conducted hearings, made findings, and adopted regulations,

but did not finally determine any insurer's rollback obligation.

Insurers also filed over fifty lawsuits in California state courts, challenging many aspects of the Commissioner's effort to implement Prop. 103. The Chief Justice of the California Supreme Court, in his capacity as Chairperson of the Judicial Council, ordered these cases coordinated before one judge in the Los Angeles Superior Court. Plaintiff Fireman's Fund has participated in two of those actions, and plaintiff USF & G in a third.

## II.

When Commissioner Garamendi took office, he gave notice of his intention to repeal the regulations adopted by his predecessor, because of alleged deficiencies [1] and because

> the present administrative approach to implementation of Proposition 103 offers little hope of processing the existing backlog of applications and threatens to engulf the Department in an [sic] tide of rate applications that are being filed at a rate faster than they are being processed.

Cal. Regulatory Notice Reg. 91, No. 4-Z, p. 161, 163. At the same time, he proposed new regulations in order to:

> (1) accelerate the process by which rollback and rate applications are fairly adjudicated;

> (2) conform administrative policy more closely to the legislative policy articulated by the voters in adopting the initiative; and

> (3) provide a more workable, coherent, internally consistent framework for rate-regulation.

*Id.* at 163–64.

Between January and August 1991, the Commissioner held public hearings and received comments on the proposed regulations. The regulations were amended several times, and each time were recirculated for additional comments. By August, the administrative record had grown to almost 50,000 pages, most of it submitted by members of the insurance industry. On August 13, 1991 the Commissioner adopted the amended regulations on an emergency basis. Amended Proposed Regulations, File No. ER–19a (Cal.Dept.Ins., August 13, 1991) [hereinafter ER–19a].[2] These are the regulations which plaintiffs challenge in this litigation.

The regulations establish a three-stage process for determining insurers' rollback obligations. First, the ratemaking formula was defined by the regulations.

Second, the values assigned to certain variables in the rate formula, and "generic issues" common to insurers, were determined after consolidated hearings (denominated RCD–1 and RCD–2) which were conducted in parallel with the hearings on the proposed regulations, and in which interested insurers and consumers participated. On August 14, 1991, after twenty-one days of hearings, the Commissioner made his RCD–1 and RCD–2 determinations in 132 pages of findings of fact. As required by the Office of Administrative Law (OAL), the original regulations were amended to reflect the substance of these findings on August 23, 1991. Emergency Regulations

---

**1.** The Commissioner objected that

[t]he rollback regulations fail to provide adequate review or validation of insurers' claims, fail to disallow expenditures in excess of those of a reasonably efficient insurer, and may permit insurers to reap profits in excess of the minimum constitutional rate. The rollback regulations also contained numerous errors, ... failed adequately to distinguish between industry-wide issues and insurer-specific issues, leaving uncertain the appropriate scope of insurer-specific hearings, and failed adequately to provide for consistent determination of industry wide facts.

Cal.Regulatory Notice Reg. 91, No. 4-Z, p. 161, 163.

**2.** Under California law, the Department of Insurance must prepare and submit to the Office of Administrative Law a summary of objections and recommendations made concerning the regulations, and an explanation of how the regulations were changed to accommodate each objection or recommendation, or the reasons for making no change. Cal.Govt.Code § 11346.-7(b)(3). The regulations were adopted on an emergency basis, giving the Commissioner an additional 120 days to complete the administrative record. *Id.* at § 11346.1.

File No. ER–20 (Cal.Dept.Ins., Aug. 23, 1991) [hereinafter ER–20]. The OAL however, rejected the Commissioner's request to adopt these generic issues amendments as emergency regulations. Cal.Regulatory Notice Reg. 91, No. 38–Z, p. 1239. On October 7, 1991 Governor Pete Wilson overruled the OAL's decision and allowed adoption of the ER–20 regulations as emergency regulations. Cal.Regulatory Notice Reg. 91, No. 43–Z, p. 1478.

This began the third stage in the process—that is, company-specific hearings, at which each insurer's rollback liability would be determined by applying the formula. On October 16, 1991 the Commissioner issued orders to fourteen insurance groups, none of them parties here, indicating the amount he believed that each must refund to its policyholders, and giving each company the choice of paying that amount or contesting it at a hearing conducted under the California Administrative Procedure Act, Cal.Govt.Code § 11500, et seq. The first such hearing was noticed for December 16, 1991.

On December 11, 1991 the first set of emergency regulations (ER–19a) expired, and the Commissioner filed a request to make them permanent (RH–291). While that request was pending, he submitted a request for readoption of the expired ER–19a regulations on an emergency basis (ER–19b). On January 10, 1992, the OAL disapproved the regulations, and refused to extend them as emergency regulations. The Commissioner amended the regulations in response to the OAL's objections, and refiled them as emergency regulations (ER–19c) on January 15, 1992. On January 17, 1992 the OAL issued a decision explaining why it had disapproved the proposed permanent regulations (RH–291). Cal.Regulatory Notice Reg. 92, No. 5–Z, p. 122. On

January 23, 1992 the OAL disapproved the Commissioner's request to adopt the amended regulations (ER–19c) as emergency regulations, and on January 28, 1992 it issued a decision explaining the reasons for its disapproval.[3] Cal.Regulatory Notice Reg. 92, No. 7–Z, p. 185.

The January 17 and January 28 decisions gave a number of reasons for rejecting the proposed regulations, most importantly that:

> Calfarm recognized the right of an individual insurer to demonstrate that a particular rate is confiscatory as to it and the insurer's right to establish a record for judicial review. Applicant's have both the right and responsibility under the statute and Calfarm to make their cases free of the restrictions of the model. Regulation section 2646.4 clearly precludes an individual insurer from offering proof, or evidence to show in a rate hearing that the model does not allow a fair and reasonable rate of return on investment. This has the effect of altering the statute and contradicts Calfarm.

Cal.Regulatory Notice Reg. 92, No. 5–Z, p. 122, 127–28.

On January 30, 1992 the Commissioner appealed to the Governor the OAL's refusal to permit adoption of the amended (ER–19c) regulations as emergency regulations. Cal.Regulatory Notice Reg. 92, No. 9–Z, p. 256. On February 10, 1992 the California Senate concurred in an Assembly resolution asking the Governor to overturn the OAL decision. On February 14, 1992 the Governor overruled the OAL decision, stating that while he agreed with the OAL's position, he was exercising his authority "in order to hasten final adjudication of substantive as well as procedural questions arising from Proposition 103." Cal.Regula-

---

**3.** The OAL disapproved the amended regulations because they do not satisfy the Authority, Consistency, Clarity and Necessity standards of Government Code section 11349.1(a). (1) The regulations restrict an insurer from showing at a rate hearing that a rate is not "excessive" or "inadequate," thus violating the Authority and Consistency standards. (2) The regulations' definitions of "excessive" and "inadequate" (primary standards established by Proposition 103

for approval of a rate) cannot easily be understood by those who are directly affected by them, thus violating the Clarity standard. (3) The commissioner has not demonstrated that the filing fees established by the regulations (which range from $500 to $225,000 per line per year) satisfy the Necessity standard.

Cal.Regulatory Notice Reg. 92, No. 7–Z, p. 185, 185.

tory Notice Reg. 92, No. 9–Z, p. 271, 274. The Governor stated that:

> I am compelled to do so because the process prescribed by the law permits unlimited appeals by the Commissioner and interminable delay for the public in reaching needed resolution by the courts of these important questions.
>
> OAL has scrupulously fulfilled its responsibility, but after more than three years of false starts and misuse of the regulatory process by the Department of Insurance and abuse of the process by insurers and their lawyers, the implementation of Proposition 103 is in shambles.
>
> . . . .
>
> As long as the resolution of the ultimate substantive questions arising from Proposition 103 is delayed by this preliminary procedural dispute, the fundamental problems cannot be resolved.
>
> . . . .
>
> There is only one reasonable recourse: either to demonstrate, in court, that these regulations, applied to a particular insurer, deny the insurer a fair hearing and a reasonable return, or to prove that the regulations are flexible enough to provide adequate individualized relief. What is needed is clear guidance from the courts on the validity of Proposition 103 rollback and rate regulation provisions as implemented by the Commissioner's regulatory methodology.

*Id.* at 274–75.

The effect of the Governor's decision was to reinstate the regulations as amended (ER–19c) for 120 days as emergency regulations. While the Governor was considering the appeal, the generic regulations (ER–20), originally rejected by the OAL and reinstated by the Governor on October 7, 1991 expired. On February 14, 1992, the Commissioner resubmitted those regulations to OAL, and on February 20, 1992 the OAL approved them as emergency regulations.

### III.

In *Calfarm*, the California Supreme Court considered the practical difficulty of implementing Prop. 103, and concluded that:

> Much is necessarily left to the Insurance Commissioner, who has broad discretion to adopt rules and regulations as necessary to promote the public welfare.... No provision bars the commissioner from consolidating cases or issuing regulations of general applicability. Thus there is nothing here which prevents the commissioner from taking whatever steps are necessary to reduce the job to manageable size.

48 Cal.3d at 824, 258 Cal.Rptr. 161, 771 P.2d 1247 (citations omitted).

Under the regulations for the rollback year, insurers may charge either the statutory twenty percent rollback rate or the minimum, nonconfiscatory rate, whichever is higher. Cal.Dept. of Ins., File No. ER–19c § 2645.3(a) (Jan. 15, 1992) [hereinafter Regs.]. For subsequent years, insurers may charge anything between the minimum and maximum permissible rate. Regs. § 2644.1. The minimum and maximum rates allow an insurer to recover its payout on policies, its costs of adjusting claims, and its fixed expenses, less certain ancillary income not derived from insurance premiums. This sum is then increased to cover state premium taxes and sales commissions, and to yield either a minimum or maximum after-tax profit that varies by mix of business, and is decreased to offset investment returns on premiums before payout and expenses.

For the rollback period actual historical data is used, and the after-tax rate of return has been fixed at 10%. An insurer's allowable fixed expenses are limited by an "efficiency standard," equal to the industry average ratio of underwriting expenses to earned premiums, calculated separately for each line of insurance. Regs. §§ 2644.12, 2645.5. The regulations disallow expenses for political contributions; lobbying expenses; executive compensation in excess of prescribed limits, based on nationwide earned premiums; bad faith judgments; unsuccessful defense of discrimination claims; fines and penalties; and institutional advertising expenses, defined as adver-

tising not aimed at obtaining business for a specific insurer or providing consumers with information pertinent to a decision whether to buy that insurer's product. Regs. §§ 2644.10(a)–(f), 2645.5(a).

## IV.

On September 3, 1991 plaintiffs Fireman's Fund and USF & G filed these lawsuits under 42 U.S.C. § 1983, challenging the constitutionality of the regulations on a number of grounds. ACIC's motion to intervene was granted, and its complaint-in-intervention was filed on October 24, 1991. Plaintiffs' claims fall into five general categories.

First and foremost, plaintiffs claim that the regulations require them to charge premium rates so low that they amount to a taking of their property without just compensation, in violation of the Fifth Amendment, made applicable to the states by the Fourteenth (the "Takings" claim).[4]

The second set of claims is directed at various components of the ratemaking formula defined by the regulations. Specifically, plaintiffs claim that the regulations treat their business expenses and federal tax benefits in a way that denies them substantive due process[5] and equal protection of the laws,[6] and violates the Commerce Clause, the McCarran Ferguson Act, and the Supremacy Clause (the "Rate Component" claims).[7]

4. Specifically, Fireman's Fund's first claim for relief alleges that the regulations will cause confiscatory losses on its lines of insurance covered by Proposition 103, because the "generic standards" will result in a confiscatory rate of return, and the ten percent rate of return ordered in RCD–2 is constitutionally inadequate, and is applied to an inadequate capital base. USF & G's second and third claims for relief allege that the regulations deny them a "fair and reasonable return," resulting in an unconstitutional taking. ACIC's seventh claim for relief also alleges that the regulations treat tax refunds received by insurers in 1989 as profits earned that year, resulting in confiscatory losses, and in certain cases count tax credits or offsets twice—once when it is available and not used, and a second time when it is used, frustrating insurers' reasonable investment-backed expectations.

5. Fireman's Fund's second claim for relief alleges that the regulations bear no rational relationship to insurance companies' actual costs or burdens, their efficiency, or their real profits; and bear no rational relationship to costs or burdens imposed on the State of California, or upon insureds, because they disregard actual expenses; use industry average expense levels; base expense data on national averages, rather than actual California results; and use federal tax rates based on nationwide insurance operations, rather than the tax due on California business. USF & G's first and third claims for relief also allege that the regulations will not permit it to earn a fair and reasonable return, denying it due process. ACIC's seventh claim for relief also alleges that the regulations count federal tax refunds as profits, arbitrarily reducing insurers' effective federal tax rates.

6. Fireman's Fund's fourth claim for relief alleges that the regulations exclude insurers' actual 1989 expenses in excess of the "efficiency standard," arbitrarily discriminating against those insurers whose actual expenses exceed the effi-

ciency standard, denying them equal protection. Fireman's Fund also alleges that under the regulations, companies with an actual pretax loss nationwide get *no* allowance for federal income tax, so that companies with similar pre-tax results from their California operations, but different results nationwide, may be treated differently, denying them equal protection. ACIC's eighth claim for relief also alleges that the regulations lower the federal tax rate in proportion to federal tax credits or offsets, which have nothing to do with the applicable tax rate for that year, arbitrarily resulting in different effective federal tax rates for insurers who have different federal tax credits in a given year, denying them equal protection.

7. Fireman's Fund's third claim for relief alleges that the regulations set caps on permissible nationwide expenses, and force insurers to pay to California insured a pro rata share of any expenses over that limit (determined by the ratio of California premiums to nationwide premiums), penalizing business conducted outside California, setting a national benchmark of proper insurance expenditures, and invading the power of the other states to regulate insurance. Fireman's Fund also alleges that the regulations apply a federal tax rate based on an insurer's nationwide profit or loss, and that profits in California can be offset by net losses in other states, resulting in a lower federal tax rate applied to insurers doing business in other states, all allegedly in violation of the Commerce Clause, the McCarran Ferguson Act and the Due Process Clause of the Fourteenth Amendment. ACIC's ninth claim for relief alleges that the regulations require insurers to give up certain federal tax refunds for the benefit of their California policyholders; set the federal tax rate deduction impermissibly low by deducting all tax credits or offsets used or available to the insurer; penalize insurers' use of tax entitlements; and set an effective tax rate that

Third, plaintiffs claim that the regulations disallow their expenses for political contributions, lobbying, institutional advertising, and unsuccessful defense of discrimination claims, which impermissibly penalizes them for exercising their First Amendment rights to free speech and to petition the government for the redress of grievances, and their right to due process guaranteed by the Fourteenth Amendment (the "First Amendment" claims).

Plaintiffs also allege that the Commissioner has refused to approve their applications for *prospective* rate increases until they have ceased litigating over their rollback liability, allegedly denying them due process and penalizing them for exercising their First Amendment right to petition the government for the redress of grievances (the "Retaliation" claim).[8] The Commissioner denies this charge and contends that the Department of Insurance is simply unable to keep up with the thousands of applications that have been filed.

Finally, plaintiffs claim that the regulations do not allow them to show that as applied to them, the resulting premium rates are constitutionally inadequate, denying them procedural due process (the "Due Process" claim). This claim arises from Regs. § 2646.4(e), which prohibits insurers from relitigating in their individual hearings matters already determined by the regulations. The individual company hearings are therefore limited to issues of whether the regulations are being correctly applied to the insurers, who allegedly may not then argue that the rates determined by the regulations are confiscatory.[9]

Plaintiffs seek: (1) a declaration that the regulations are unconstitutional; (2) a permanent injunction against their use or enforcement; and (3) a permanent injunction ordering the Commissioner to consider their applications for prospective rate increases notwithstanding continued litigation over rollbacks.

does not accommodate the full value of the federal tax rate, in violation of federal tax law and the Supremacy Clause.

## V.

The Commissioner has moved to dismiss these actions, on the grounds that plaintiffs' claims are not ripe for adjudication, or in the alternative, that abstention is appropriate under the *Burford, Younger, Pullman,* and *Colorado River* doctrines (cited and discussed below).

The motions were briefed, argued, and submitted for decision. This court has considered the moving and opposing papers, the extensive record, and the applicable authorities. The court concludes plaintiffs' claims must be dismissed, either because they are not ripe for constitutional adjudication or because of principles of abstention.

## VI.

### RIPENESS

In a challenge to administrative regulations, the purpose of the ripeness requirement is: "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967). To determine whether such a controversy is ripe, the court should "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* 387 U.S. at 149, 87 S.Ct. at 1515. This means that the agency action must be final, and that its impact on plaintiffs must be "sufficiently direct and immediate as to render the issue appropriate for judicial review." *Id.* at 152, 87 S.Ct. at 1517. In this case, both factors militate against a finding that all of plaintiffs' claims are ripe: the regulations are not final, and

8. Fireman's Fund's fifth claim for relief encompasses both First Amendment and Retaliation.

9. USF & G's first claim for relief.

there is no certainty that they will be applied to plaintiffs in their present form.

## A. *The Status of the Regulations*

The Governor reinstated the amended regulations (ER–19c) as emergency regulations. The generic regulations (ER–20), which contain components of the ratemaking formula, including the 10% rate of return, were approved by the OAL as emergency regulations on February 20, 1992. Emergency regulations cannot remain in effect for more than 120 days without extension approved by the OAL, or unless the OAL approves them as permanent.

In its January 28 decision, the OAL disapproved the identical (ER–19c) regulations. The OAL lacks the Governor's discretionary authority, and is "constrained by the narrow compliance review standard set forth in Government Code § 11349.1." Cal.Regulatory Notice Reg. 92, No. 9–Z, p. 271, 274. The Governor has stated unequivocally that "no further appeals on Proposition 103 regulations will be entertained by [his] Office." *Id.* at 275.

Thus, it appears probable that the regulations will become ineffective 120 days from the Governor's February 14, 1992 decision, unless the Commissioner amends them to satisfy the OAL. Since the Commissioner and the OAL appear to differ on whether insurers have the right in their individual hearings to show that the rates mandated by the regulations are confiscatory as applied to them, this appears unlikely.

Individual company hearings have not been scheduled for Fireman's Fund, USF & G, or any of ACIC's members during this 120 day period. Thus, it is uncertain whether the present regulations will be applied to plaintiffs. While a state court may eventually overrule the OAL's anticipated rejection of the regulations, this court will not speculate on the outcome of litigation that has not and may not commence. It is also possible that the Commissioner may amend the regulations to satisfy the OAL,

and permit insurers to challenge the rates as confiscatory in their individual hearings. Whatever the outcome of the present disputes among the Commissioner, the Governor, and the OAL, most of plaintiffs' claims are unripe, and may in course of time become moot. Further, even if the regulations were now enforceable against plaintiffs, several of their claims would not be ripe for additional reasons.

## B. *The Takings Claims*

■ The Commissioner argues that plaintiffs' takings claims are not ripe for adjudication until their company-specific hearings are held, and the rate-making process is complete. In *New Orleans Pub. Serv., Inc. v. New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (*"NOPSI"*), the United States Supreme Court reaffirmed the holding of *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908), that "ratemaking is an essentially legislative act," and that "to preserve the integrity of a unitary and still-to-be-completed legislative process," challenges to a rate order are unripe until the legislative process is complete. *NOPSI*, 491 U.S. at 371, 372, 109 S.Ct. at 2519, 2520.[10]

As the California Supreme Court noted in *Calfarm:*

> The state and federal Constitutions are concerned not so much with the way in which the initial rates are set as with whether the rates as finally set are confiscatory. [I]t is the result reached not the method employed which is controlling.

48 Cal.3d at 816, 258 Cal.Rptr. 161, 771 P.2d 1247 (quoting *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944)).

Plaintiffs respond that the results of the company-specific hearings can already be predicted with mathematical certainty, since they involve only an application of the ratemaking formula to historical facts, and

---

**10.** As explained below, this court also concludes that the ratemaking process in this case is judicial, not legislative as far as the determination

of rollback obligations is concerned, making *Younger* abstention appropriate.

that they need not await the inevitable to seek relief, citing *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974):

> Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect.

*Id.* 419 U.S. at 143, 95 S.Ct. at 358. However, in that case, the Court continued:

> There are situations where, even though an allegedly injurious event is certain to occur, the Court may delay resolution of constitutional questions until a time closer to the actual occurrence of the disputed event, when a better factual record might be available.

*Id.* (citation omitted). *Accord Pacific Legal Found. v. State Energy Resources, Conservation & Dev. Comm'n,* 659 F.2d 903, 915 (9th Cir.1981) ("if the issue would be illuminated by the development of a better factual record, the challenged statute or regulation is generally not considered fit for adjudication until it has actually been applied"). This situation was expressly contemplated by the California Supreme Court in *Calfarm,* when it said that:

> Proposition 103 contemplates that any rate set by the commissioner will be subject to judicial review. At the time of any such review, the court will have before it an administrative record that will undoubtedly contain vital ratemaking information and the commissioner's evaluation of the impact of that rate on the insurer and the insured. That record will make possible a more informed analysis of any claim that the rate set by Proposition 103 is confiscatory as to a particular insurer and line of insurance.

48 Cal.3d at 825 n. 18, 258 Cal.Rptr. 161, 771 P.2d 1247 (citation omitted).

Plaintiffs argue that since the regulations forbid "relitigation" of matters already determined by the regulations, the individual company hearings will not meaningfully supplement the fact record. Undoubtedly, the record developed in such hearings will not contain all of the information contemplated by the court in *Calfarm.* However, as the Commissioner points out, "the regulations are hardly self-executing." The first order issued to an insurer contains a 21 page computer printout applying the regulations. And while the regulations do not permit insurers to relitigate matters determined by the regulations, they do permit insurers to challenge the Department's calculations. While the development of such a fact record may seem a mere formality to plaintiffs, it would be of great assistance to the courts in adjudicating the merits of plaintiffs' claims.

Plaintiffs cast their Takings claim as a facial challenge to the regulations, and argue that the regulations do not permit *any* insurer to earn a constitutionally sufficient rate of return—so that the results of the company-specific hearings are irrelevant. They argue that the 10% rate of return set by the Commissioner is the constitutional minimum, and that any improperly disallowed expenses, or improper decreases in the capital base to which the rate of return is applied, have the effect of lowering the rate below the constitutional minimum. Plaintiffs assume that the Commissioner selected the 10% figure in a vacuum. By itself, the figure has no constitutional dimension. And it is not *res judicata* on the issue of what constitutes the minimum non-confiscatory rate. As the Commissioner points out, "[t]he 10 percent is not the 'end result' of the regulations but merely a component." It is the end result that counts. And the results will not be known until the individualized rate hearings are completed. Until then, plaintiffs' Takings claims are unripe.

Plaintiffs cannot now attack the individual rate components as confiscatory. In *Federal Power Comm'n v. Hope Natural Gas Co.,* the United States Supreme Court held that

> [I]t is the result reached not the method employed which is controlling. It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry ... is at an end. The fact that the method

employed to reach that result may contain infirmities is not then important.

*Id.* 320 U.S. at 602, 64 S.Ct. at 287 (citations omitted). In *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 310, 109 S.Ct. 609, 617, 102 L.Ed.2d 646 (1989), the Court "reaffirm[ed] these teachings of *Hope Natural Gas."* The Court elaborated:

[A]n otherwise reasonable rate is not subject to constitutional attack by questioning the theoretical consistency of the method that produced it. "It is not theory, but the impact of the rate order which counts." *Hope,* 320 U.S., at 602 [64 S.Ct. at 287]. The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result. The Constitution is not designed to arbitrate these economic niceties. Errors to the detriment of one party may well be cancelled out by countervailing errors or allowances in another part of the rate proceeding. The Constitution protects the utility from the net effect of the rate order on its property. Inconsistencies in one aspect of the methodology have no constitutional effect on the utility's property if they are compensated by countervailing factors in some other aspect.

*Id.* 488 U.S. at 314, 109 S.Ct. at 619. For that reason, it is only the result and not the rules themselves that is put to a constitutional test. For this reason, plaintiffs' Takings claims are unripe.

C. *The Rate Component Claims*

■ Plaintiffs claim that the efficiency standard and federal income tax factor in the regulations deny them due process, because they are irrational and premised on no evidence; and deny them equal protection because they arbitrarily discriminate against insurers who had above average expenses, nationwide net losses, or tax credits. The Commissioner initially argued that these claims were unripe because the administrative record had not yet been completed. However, the Commissioner has now completed and filed with the OAL the record pertinent to these regulations. Since these claims can be determined by reference to an administrative record that

is closed, they *may* be ripe but for the fact that the regulations may expire before they are applied to plaintiffs.

In *Northern Pacific Railway Co. v. Department of Public Works,* 268 U.S. 39, 45 S.Ct. 412, 69 L.Ed. 836 (1925), the United States Supreme Court held that an order using weighted average operating costs to set rates for a number of different carriers was invalid:

mere error in reasoning upon evidence introduced, does not invalidate an [administrative] order. But *where rates found by a regulatory body are attacked as being confiscatory,* courts may enquire into the method by which its conclusion was reached. An order based upon a finding made without evidence, or upon a finding made upon evidence which clearly does not support it, is an arbitrary act against which courts afford relief. The error under discussion was of this character. It was a denial of due process.

*Id.* 268 U.S. at 44–45, 45 S.Ct. at 413–414 (emphasis added). It is unclear from this passage whether such a Due Process claim may be litigated separately from the underlying Takings claim. In that case, the rate schedule had been finally determined, and both claims were ripe. However, the right to be free from arbitrary or irrational economic regulation implicates a separate right. The same is true of plaintiffs' Equal Protection claims, although the analysis is essentially the same. *See Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Although it may be theoretically possible to determine whether the challenged regulations are arbitrary or irrational by referring to a 50,000 page administrative record, the task would be greatly simplified once the regulations have been actually applied. For this reason, and because plaintiffs will suffer no injury until that time, these claims are unripe. *Cf. Duke Power,* 438 U.S. at 81–82, 98 S.Ct. at 2634–2635 (challenge ripe because actual occurrence of nuclear accident would not advance ability to deal with legal issues and

all parties would be adversely affected by delayed resolution).

■ Plaintiffs also claim that the use of national data to calculate the efficiency standard, excluded expenses, and the federal income tax factor penalizes insurers for doing business in other states, in violation of the Commerce Clause, McCarran–Ferguson Act, and Due Process. The Commissioner disputes plaintiffs' interpretation of the regulations, and argues that the regulations require the use of accurate, California-only data in most instances; and that in the rest, the regulations allocate national expenses rationally and fairly. Since it remains to be seen how these regulations will be applied, and in particular how plaintiffs' national expenses will be allocated, review of these issues is not ripe.

### D. The First Amendment and Retaliation Claims

■ In a sense, plaintiffs' First Amendment claims are merely part of their Rate Component claims. That is, if the expenses are disallowed, plaintiffs are injured monetarily. The Retaliation Claim does not involve the regulations, but rather the alleged refusal of the Commissioner to rule on applications for *prospective* rate increases so long as the insurers litigate their rollback obligations.

However, these claims do implicate First Amendment rights. *See, e.g., Riley v. National Federation of the Blind*, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (facial challenge to statute limiting professional fundraisers' fees implicates First Amendment). The Commissioner argues that consumers should not be forced to

subsidize the insurers' speech activities, but this argument goes to the merits and not the ripeness of plaintiffs' First Amendment claims. Since the regulations disallow these expenses in their entirety, no more informed analysis will be possible after insurers' individual hearings. But for the fact that the regulations may never be enforced against plaintiffs, their First Amendment claims would be ripe.

### E. The Due Process Claims

■ Plaintiffs' Due Process claim can be decided without applying the challenged regulations. In *Calfarm*, the California Supreme Court held that insurers had a right to demonstrate that the rates established by Prop 103 were confiscatory as applied to them. However, *Calfarm* did not decide whether insurers were entitled to make this showing at the administrative level, or only on judicial review. In *Guaranty Nat'l Ins. Co. v. Gates*, 916 F.2d 508 (9th Cir.1990), the Ninth Circuit struck down Nevada's version of Prop 103 because it did not provide insurers with a means for relief from potentially confiscatory rates.

In this case the insurers challenge section 2646.4(e) of the regulations, which prohibits them from attempting to show, in their individual hearings, that the rates set by the regulations are confiscatory as applied to them.[11] Unlike plaintiffs' Takings and Rate Component claims, this claim attacks the sufficiency of the *procedures* used to determine plaintiffs' rollback obligations, not the obligations themselves, and no more informed analysis of this claim

---

**11.** As originally proposed, this section provided that:

"Relitigation in a hearing on an individual insurer's rates of a matter already determined either by these regulations or by a generic determination is out of order and shall not be permitted." After the OAL disapproved the regulations on January 17, 1992, the section was amended by adding the following language:

However, the administrative law judge shall admit evidence he or she finds relevant to the determination of whether the rate is excessive or inadequate (or, in the case of a proceeding under Article 5, relevant to the determination of the minimum nonconfiscatory rate),

whether or not such evidence is expressly contemplated by these regulations, provided the evidence is not offered for the purpose of relitigating a matter already determined by these regulations or by a generic determination.

The Commissioner argues that this change constitutes an unsettled issue of state law. The Court agrees with the OAL that "the changes made to subsection (e) are cosmetic. The provision is now circular; subsections (e) and (b) of section 2646.4 together continue to restrict rate hearings to a determination as to whether the model has been properly applied." Cal.Regulatory Notice Reg. 92, No. 7–Z, p. 185, 190.

will be possible after their individual hearings are concluded. But for the fact that the regulations themselves, and especially section 2646.4(e) may never be enforced against plaintiffs, their Due Process claim would be ripe.

The Commissioner attempts to avoid a facial Due Process challenge by arguing that the *Calfarm* and *Gates* holdings involved challenges to statutes that departed from the constitutional standard of a fair and reasonable return, while the Commissioner's regulations strive to implement it. However, this argument goes to the merits, not the ripeness, of plaintiffs' Due Process claims. Plaintiffs claim they have a constitutional right to challenge the rates defined by the regulations as confiscatory in their administrative hearings. This court cannot say that this claim is unripe until those very hearings are concluded.

## VII.

## ABSTENTION

By dismissing plaintiffs' claims as unripe, it is not strictly necessary to decide whether abstention is appropriate as to these claims. Nevertheless, at some point plaintiffs' claims may ripen, and the parties have framed and extensively discussed the abstention issues.

The various abstention doctrines attempt to reconcile the conflicting pressures of

> the desire to avoid premature constitutional determinations, to defer to state tribunals on questions of state law, to avoid duplicative proceedings, and to interfere as little as possible with state processes, on the one hand; and the desire to uphold a litigant's choice of a federal forum and to vindicate federal rights without undue delay on the other.

Hart & Wichsler, *The Federal Courts and the Federal System*, (Paul M. Bator, et al. eds., 3d ed. 1988). As the United States Supreme Court explained,

> The various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases. Rather, they reflect a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes.

*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11 n. 9, 107 S.Ct. 1519, 1526 n. 9, 95 L.Ed.2d 1 (1987).

At the same time, however, the Court has consistently cautioned that it has "carefully defined ... the areas in which such 'abstention' is permissible, and it remains 'the exception, not the rule.' " *NOPSI*, 491 U.S. at 359, 109 S.Ct. at 2512 (quoting *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984)). The Commissioner argues that this court should abstain under each of the four such doctrines recognized by the United States Supreme Court, namely *Burford, Younger, Pullman,* and *Colorado River.* The court will consider each of these in turn.

### A. *Burford* Abstention

In *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), Sun Oil attacked a permit granted by the Texas Railroad Commission, claiming that the commission had denied it due process by improperly applying Texas' complex oil and gas conservation laws. The United States Supreme Court concluded that "a sound respect for the independence of state action" required the federal district court to "stay its hand," *id.* 319 U.S. at 334, 63 S.Ct. at 1107, because Texas had established a centralized system of judicial review of commission orders, which permitted its courts to acquire specialized knowledge. *Id.* at 325–27, 63 S.Ct. at 1103–04. The Court found this system of review "expeditious and adequate," and determined that concurrent review in federal court would inevitably lead to "[d]elay, misunderstanding of local law, and needless federal conflict with state policy." *Id.* at 334, 327, 63 S.Ct. at 1107, 1104.

Similarly, in *Alabama Pub. Serv. Comm'n v. Southern Ry. Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), a railroad challenged the Alabama Public Service Commission's refusal to permit it to discontinue service on unprofitable rail lines as a violation of due process. Under

Alabama law, appeals from commission orders were concentrated in one state circuit court. *Id.* 341 U.S. at 348, 71 S.Ct. at 767. As in *Burford,* the Court found that this review was adequate, and determined that the constitutional claim depended upon the "predominantly local factor of public need for the service" sought to be discontinued. *Id.* 341 U.S. at 347, 349, 71 S.Ct. at 767, 768. Under these circumstances, the Court held that comity and "the avoidance of needless friction with state policies" required the federal district court to abstain from exercising its jurisdiction. *Id.* at 350, 71 S.Ct. at 768 (quoting *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941)).

■ These cases and their progeny coalesced into the *"Burford* doctrine," most recently articulated by the Court as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*NOPSI,* 491 U.S. at 361, 109 S.Ct. at 2514 (quoting *Colorado River,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483).

■ Even after the Supreme Court rearticulated the *Burford* doctrine in *NOPSI,* the Ninth Circuit continues to require the presence of three factors for *Burford* abstention:

> (1) that the state has concentrated suits involving the local issue in a particular court; (2) the federal issues are not easily separable from complicated state law issues with which the state courts may have special competence; and (3) that

federal review might disrupt state efforts to establish a coherent policy. *Tucker v. First Maryland Sav. & Loan, Inc.,* 942 F.2d 1401, 1405 (9th Cir.1991) (citing *Knudsen Corp. v. Nevada State Dairy Commission,* 676 F.2d 374, 377 (9th Cir.1982)). This appears to be a more stringent test than *NOPSI,* in that *NOPSI* requires only timely and adequate state court review, while the Ninth Circuit requires that suits be concentrated in a particular court; and *NOPSI* requires *either* the presence of difficult questions of state law *or* the disruption of state efforts to establish a coherent policy, while the Ninth Circuit requires both.

■ Under either test, a threshold inquiry is whether the issues involve "policy problems of substantial public import" or "matters of substantial public concern" under *NOPSI,* or "local issues" under *Tucker* and *Knudsen.* The rate rollbacks at issue in this case qualify as all three. Congress has expressly declared that it is "in the public interest" that insurance regulation be left to the states. McCarran–Ferguson Act, 15 U.S.C. § 1011. The text of Prop. 103 begins with a declaration that:

> Enormous increases in the cost of insurance have made it both unaffordable and unavailable to millions of Californians. The existing laws inadequately protect consumers and allow insurance companies to charge excessive, unjustified and arbitrary rates.
>
> Therefore, the People of California declare that insurance reform is necessary. First, property-casualty insurance rates shall be immediately rolled back to what they were on November 8, 1987, and reduced no less than an additional 20%.

Proposition 103, § 1 (uncodified). *See generally Calfarm,* 48 Cal.3d at 812–13, 258 Cal.Rptr. 161, 771 P.2d 1247.

### 1. Concentration of Suits in a State Forum

Plaintiffs do not dispute that "timely and adequate state court review" of rate rollback orders is available,[12] and that suits

---

**12.** *See Calfarm,* 48 Cal.3d at 825 n. 18, 258

Cal.Rptr. 161, 771 P.2d 1247 ("Proposition 103

involving the implementation of Prop. 103 have been "concentrated" before Judge Janavs of the Los Angeles Superior Court.[13] However, they characterize this concentration as a "routine ministerial exercise," and insist that *Burford* requires a "specialized court system" having exclusive jurisdiction under state law, citing *Kirkbride v. Continental Casualty Co.*, 933 F.2d 729, 734 (9th Cir.1991). That case involved an insurance coverage dispute that had been removed to federal court. The district court remanded on abstention grounds, because the only questions to be decided related to California insurance law. *Id.* The Ninth Circuit held that

> the fact that California has not established a specialized court system to resolve disputes over insurance policy coverage convinces us that application of the *Burford* doctrine to this case is unwarranted.

*Id.* However, this statement from *Kirkbride* must be read as a part of its preceding discussion that *Burford* abstention requires "state efforts to establish a coherent policy." *Id.*

Similarly, in *Privitera v. California Board of Medical Quality Assurance*, 926 F.2d 890 (9th Cir.1991), the court held that *Burford* abstention in a dispute over a license to practice medicine was inappropriate because:

> deciding this case would not interfere with any similar effort by California to maintain *consistency* in a complex area of law because California had not estab-

lished any such system of concentrated judicial review.

*Id.* at 895. (emphasis added)

In *Almodovar v. Reiner*, 832 F.2d 1138 (9th Cir.1987), a First Amendment challenge to California's pandering and prostitution laws, the court held that "California has not established a specialized court system to review prostitution and pandering charges that would justify *Burford* abstention," *id.* at 1141, relying exclusively on *J–R Distrib., Inc. v. Eikenberry*, 725 F.2d 482 (9th Cir.1984), which observed that

> [w]e have traditionally applied the *Burford* doctrine to cases where suits involving the local issue have been concentrated in an individual state court and where the federal issues are inextricably bound up with state issues which state courts may be *especially competent* to deal with.

*Id.* at 488 n. 6 (citation omitted).[14]

The *Burford* case itself identified two virtues to consolidated state review: consistent adjudication and specialized knowledge. 319 U.S. at 326–27, 63 S.Ct. at 1103–04. As plaintiffs acknowledge, the United States Supreme Court has not expressly required a "specialized state-court system" in its formulation of the test for *Burford* abstention. To the contrary, *NOPSI* requires only "timely and adequate state-court review." 491 U.S. at 361, 109 S.Ct. at 2514. This court concludes that a "specialized" state court system is not a requirement for *Burford* abstention. Rath-

---

contemplates that any rate set by the commissioner will be subject to judicial review. (*See* § 1861.09)").

**13.** In December 1989, California Chief Justice Malcolm Lucas, in his capacity as Chairperson of the Judicial Council of California, assigned Sacramento Superior Court Judge Richard Park to determine whether the then four pending cases relating to the implementation of Proposition 103 should be coordinated pursuant to California Code of Civil Procedure section 404 *et seq.* and California Rules of Court, Rule 1501 *et seq.*, under the special title "Proposition 103 Implementation Cases." In January 1990, Judge Park issued an order coordinating the actions, and recommended to the Judicial Council that the cases be transferred to Los Angeles Superior Court for efficiency and the conve-

nience of the parties. The Judicial Council adopted Judge Park's recommendation, and the coordinated cases were reassigned to Judge Miriam Vogel. After Judge Vogel was elevated to the Court of Appeal in May, 1990, Chief Justice Lucas issued an amended order reassigning the Proposition 103 Implementation Cases, then 22 in number, to Judge Dzintra Janavs. Cases filed subsequently have either been formally added-on to the coordinated actions pursuant to Rule 1544 of the California Rules of Court, or have otherwise made their way before Judge Janavs. Presently, every Superior Court case relating to the implementation of Proposition 103 is or has been heard before her.

**14.** Both *Almodovar* and *J–R Distrib.* predate *NOPSI*.

er, such a system is only *evidence* of state efforts to establish a coherent policy and develop special competence to adjudicate certain questions of state law.

Prop. 103 was passed in November 1988. In May 1989 the California Supreme Court announced in its *Calfarm* decision that insurers could apply for exemptions from Prop. 103's rate rollback requirements, and that the Commissioner's rulings on those applications would be subject to judicial review. 48 Cal.3d at 823–24, 825 n. 18, 258 Cal.Rptr. 161, 771 P.2d 1247. Six months after that decision, the Chief Justice of the California Supreme Court, in his capacity as chairperson of the Judicial Council of California, issued an order referring the Prop. 103 cases to a single judge. Thus, an organ of the same branch of state government that recognized, and in a sense created, the right to apply for an exemption has taken steps to insure that disputes related to those applications will be referred to a single judge.

It is the fact that judicial review has been consolidated, not the means by which this has been accomplished, that is significant here. There is no more certain way to promote consistent adjudications and the development of judicial expertise, the state interests underlying *Burford* abstention, than by referring cases to a single judge. In fact, the Commissioner successfully opposed the only effort to challenge the regulations in another forum for precisely these reasons.[15]

If the United States Supreme Court's disclaimer about "rigid pigeonholes" in *Pennzoil v. Texaco* has vitality, it should be sufficient to look inside the hole and find the pigeon. The fact that judicial review has been consolidated is sufficient evidence that California is making an effort to establish a coherent policy in implementing the rate rollback provisions of Prop. 103.

### 2. Inter–Relationship of State and Federal Issues

*Burford* abstention is inappropriate unless the "federal issues are not easily separable from complex state law issues." *Knudsen Corp. v. Nevada State Dairy Comm'n*, 676 F.2d 374, 377 (9th Cir.1982).

Although the rate provisions of Prop. 103 itself are simple, the regulations implementing them are not. Under the regulations, both rollback and future rates are determined by common formulas, using different profit factors. For the rollback year, an insurer is permitted to charge only the minimum earned premium. Regs. § 2654.3(a). For subsequent years, insurers may charge anything between the minimum and maximum earned premium. Regs. § 2644.1. The formulas are complex. Regs. §§ 2644.2, 2644.3. Variables in the formulas are themselves determined by separate formulas, each with specialized insurance accounting terms.

Although the use of historical data for the rollback period simplifies the task somewhat, § 2645.2(d), this court would have to apply the specialized state insurance accounting principles in these regulations to concrete sets of facts, or consider them in the abstract. As discussed above, it is the result reached and not the method employed that is constitutionally significant. Plaintiffs' claims that application of the regulations will lead to a taking of their property without just compensation is quite literally "entangled in a skein of state law that must be untangled before the federal case can proceed." *NOPSI*, 491 U.S. at 361, 109 S.Ct. at 2514 (quoting *McNeese v. Board of Educ. for Community Unit*

---

**15.** After the Commissioner issued his orders to show cause, Twentieth Century Insurance Company filed a petition in San Francisco Superior Court seeking to enjoin the Commissioner from holding its company specific hearing. The Commissioner petitioned to add that case to the coordinated actions pending in Los Angeles Superior Court, on the ground that "[c]oordination of all of these cases in a single court, before a single judge, would eliminate the possibility of inconsistent rulings and would promote the most efficient and economic use of judicial resources." Respondent's Memorandum of Points and Authorities in Support of Petition for Coordination, *20th Century Ins. Co. v. Garamendi*, JCCP No. 2419 [San Francisco Superior Ct. No. 938470] (Los Angeles Superior Ct.) at 6–7. The case was added to the coordinated actions over the insurer's objections, which the judge ruled were frivolous and in bad faith. The insurer was represented by the same law firm which represents ACIC in this action.

*School Dist. 187, Cahokia,* 373 U.S. 668, 674, 83 S.Ct. 1433, 1437, 10 L.Ed.2d 622 (1963)).

3. Disruption of a Coherent State Policy

The third requirement for *Burford* abstention under *Tucker* and *Knudsen* and an alternate basis under *NOPSI,* is that "federal review might disrupt state efforts to establish a coherent policy."

■ The Commissioner argues that federal review would be disruptive, since many insurers would turn to the federal courts for relief from their rate orders, and the federal court would become an independent forum for the review of individual regulatory decisions—raising the possibility of inconsistent adjudications and undermining the states' efforts to maintain uniformity. Relying primarily on a First Circuit line of precedent, plaintiffs argue that *Burford* abstention is appropriate only when federal action might lead to an *inconsistent* application of state law, and that their facial challenges do not raise this danger; that is, if they are successful, the regulations will not be applied inconsistently—they will not be applied at all. *Bath Memorial Hosp. v. Maine Health Care Fin. Comm'n,* 853 F.2d 1007, 1013–15 (1st Cir.1988). As one court put it:

> The state has no right to an unconstitutional policy, coherent or otherwise. "Once [constitutionality] is known, state policy can be as coherent as it wishes to be."

*Allstate Ins. Co. v. Sabbagh,* 603 F.2d 228, 232 (1st Cir.1979) (quoting *Kartell v. Blue Shield of Massachusetts, Inc.,* 592 F.2d 1191, 1196 (1st Cir.1979) (Coffin, C.J., dubitante)).[16] If plaintiffs were correct in their characterization of their claims as a purely "facial attack," they are probably correct and *Burford* abstention is inappropriate. But since this court concludes that the Takings and Rate Component claims cannot be presented as facial challenges, but only as applied to particular insurers, *Burford* abstention is appropriate as to those claims. But because plaintiffs' First Amendment, Retaliation, and Due Process claims involve true facial challenges to the regulations, *Burford* abstention is inappropriate as to these claims.

**B.** *Younger Abstention*

In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the United States Supreme Court held that federal courts should not enjoin ongoing state criminal prosecutions, absent a showing of harassment or bad faith. The Court noted that the defendant there had an opportunity to raise his constitutional claims in the pending state criminal proceedings, and determined that abstention was required by principles of comity and federalism: "[T]he National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Id.* 401 U.S. at 44, 91 S.Ct. at 750. The Court further stated:

> Procedures for testing the constitutionality of a statute "on its face" … and for then enjoining all action to enforce the statute until the State can obtain court

**16.** *See also, NOPSI.* In that case, the Federal Energy Regulatory Commission (FERC) allocated the cost of building and operating a nuclear reactor among several electric utilities. One of the utilities sought a rate increase from the New Orleans City Council to cover its share of the costs. The council denied recovery of part of the costs, because it found the utility acted imprudently in managing its investment, and should have sold off at least part of its interest in the reactor.

The utility filed suit in federal district court, contending that the council's order was preempted by federal law under *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986), which held that a local ratemaking body may not differ from FERC's allocations of wholesale power by imposing its own judgment of what would be just and reasonable. The district court abstained under *Burford* and *Younger.*

The Supreme Court reversed, holding that *Burford* abstention was inappropriate because no inquiry beyond the four corners of the Council's retail rate order is needed to determine whether it is facially pre-empted by FERC's allocative decree and relevant provisions of the Federal Power Act. Such an inquiry would not unduly intrude into the processes of state government or undermine the State's ability to maintain desired uniformity.

*NOPSI,* 491 U.S. at 363, 109 S.Ct. at 2515.

approval for a modified version, are fundamentally at odds with the function of the federal courts in our constitutional plan.... [E]ven when suits of this kind involve a "case or controversy" sufficient to satisfy the requirements of Article III of the Constitution, the task of analyzing a proposed statute, pinpointing its deficiencies, and requiring correction of these deficiencies before the statute is put into effect, is rarely if ever an appropriate task for the judiciary. The combination of the relative remoteness of the controversy, the impact on the legislative process of the relief sought, and above all the speculative and amorphous nature of the required line-by-line analysis of detailed statutes ordinarily results in a kind of case that is wholly unsatisfactory for deciding constitutional questions....

*Id.* at 52–53, 91 S.Ct. at 754–755 (citation omitted).

■ In *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), the *Younger* doctrine was extended to quasi-criminal proceedings, and to require exhaustion of state appellate remedies. In subsequent cases, the doctrine was expanded to encompass (1) all ongoing state judicial proceedings that (2) implicate important state interests and (3) provide an adequate opportunity to raise constitutional challenges. *Middlesex Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982), and cases cited therein. Finally, in *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), the Court determined that the *Younger* doctrine also applies to ongoing state administrative proceedings that are judicial in nature. *Id.* 477 U.S. at 627 & n. 2, 106 S.Ct. at 2723 & n. 2; *see also, Middlesex*, 457 U.S. at 433–34, 102 S.Ct. at 2522 (bar disciplinary proceedings); *Fresh Int'l. Corp. v. Agric. Labor Relations Bd.*, 805 F.2d 1353, 1357 (9th Cir.1986) ("*Dayton* clearly establishes that

state administrative proceedings ... are entitled to the same deference from the federal courts as are state judicial proceedings, provided that the traditional prerequisites for application of the *Younger* doctrine have been met").

## 1. Pending State Judicial Proceedings

■ There is no doubt that both the Commissioner's regulatory proceedings and some state court litigation were commenced before this federal suit was filed. But abstention under *Younger* is appropriate only if the state administrative proceedings are judicial in nature. In *NOPSI*, the Court held that *Younger* abstention was inappropriate because the challenged rate-making order was a *legislative* act, and *Younger* does not require abstention "in deference to a state judicial proceeding reviewing legislative or executive action." 491 U.S. at 368, 369–71, 109 S.Ct. at 2518, 2519–20.[17] In reaching this conclusion, the Court adopted the analysis of *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908), in which several railroads challenged passenger rates set by a state agency.

> "A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative and not judicial in kind...."

*NOPSI*, 491 U.S. at 370–71, 109 S.Ct. at 2519–20 (quoting *Prentis*, 211 U.S. at 226, 29 S.Ct. at 69).

In this case the regulations under attack have a dual character. As to rollback obligations, they are quasi-judicial; as to fu-

---

**17.** The Court offered no explanation for this distinction, except to say that "[s]uch a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case

in deference to the States." 491 U.S. at 368, 109 S.Ct. at 2518. Neither do the authorities cited for this proposition illuminate the significance of the legislative-judicial distinction.

ture rates they are quasi-legislative. The determination of the insurers' rollback obligations is not "the making of a rule for the future." In *Calfarm,* the California Supreme Court delegated to the Commissioner the task of determining the insurers' rollback obligations under *existing* law; that is, Prop. 103, as modified by the *Calfarm* decision. The adoption of regulations is merely an interim step in that process. The Commissioner's ultimate job is to determine how much each insurer must refund while still permitting the insurer a constitutional rate of return. This is precisely the task plaintiffs would have this court undertake: in order to declare a particular rate confiscatory, the court would necessarily have to determine the minimum nonconfiscatory rate. This is primarily a judicial task. The resulting rollbacks will necessarily be *enforced* in the future, but that is the character of every judicial decree.

Plaintiffs object that the Commissioner has himself characterized the ratemaking process, and in particular the RCD–1 and RCD–2 hearings, as "quasi-legislative." [18] That position was rejected by Judge Janavs in *Hartford Steam Boiler Inspection and Ins. Co. v. Garamendi,* No. BC 023 983 (Los Angeles Superior Ct. April 8, 1990) (order denying preliminary injunction), which determined that the RCD–1 and RCD–2 hearings, and the individual company-specific hearings to follow, were "adjudicatory" in nature, because under Insurance Code section 1861.08, all hearings on rollback exemptions must comply with the provisions of the California Administrative Procedure Act, Cal.Govt.Code § 11500–11528. [19]

Hearings under the Administrative Procedure Act must be conducted by an administrative law judge, and parties have the right to discovery, to call and cross-examine witnesses, and to a written statement of decision. The Commissioner relies on these rights and procedures to support the proposition that the hearings are quasi-judicial in nature. He cites *Morgan v. United States,* 298 U.S. 468, 480, 56 S.Ct. 906, 911, 80 L.Ed. 1288 (1936) in support of his argument. However, in that case, the Court observed that while the hearings themselves were quasi-judicial, the resulting order fixing rates was legislative. *Id.* 298 U.S. at 479, 56 S.Ct. at 911. The same distinction was made in *Prentis,* and reaffirmed in *NOPSI:*

> "[I]t does not matter what inquiries may have been made as a preliminary to the legislative act. Most legislation is preceded by hearings and investigations. But the effect of the inquiry, and of the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up. ... *The nature of the final act determines the nature of the previous inquiry.* As the judge is bound to declare the law he must know or discover the facts that establish the law. So when the final act is legislative the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case."

211 U.S. at 227, 29 S.Ct. at 69–70, *quoted in NOPSI,* 491 U.S. at 371, 109 S.Ct. at 2519 (emphasis added).

In this case, the "final act" is a determination of the insurers' rollback obligations.

---

18. "These proceedings are part of the ratemaking process and involve the making of general findings applicable to numerous companies' rates. As such, they are properly classified as quasi-legislative proceedings." *In re Determination of Exposure Basis,* File No. RCD–1, at 2 (Cal. Ins. Comm'r, February 21, 1991) (notice of hearings). The same language appears on page 2 of the RCD–2 notice issued the same day.

19. The issue arose in *Hartford Steam Boiler* when plaintiffs challenged Commissioner Garamendi's authority to abandon his predecessor's generic determinations and conduct new hearings. The Commissioner urged that the determinations were made as part of the quasi-legislative process of determining insurers' rate rollback obligations, and that he was therefore not bound by his predecessor's determinations. The court held that the generic determinations were adjudicatory in nature, but "only a step in the adjudicatory process, an interlocutory determination." Because they were not final, they were not binding on Commissioner Garamendi, and he was free to revisit those issues. No. BC 023 983 at 3–6.

As Judge Janavs stated in *United Services Automobile Assoc. v. Gillespie,* JCCP No. 2419 at 4 (Los Angeles Superior Ct. July 31, 1990) (order denying preliminary injunction): "The company-specific hearings are a continuation of the adjudicatory process and until they are held, there is no final rate rollback adjudication as to any insurer."

As to future rates, the regulations are quasi-legislative: they make "rules for the future." However, a challenge to the regulations' impact on prospective rates is even less ripe than a challenge to their impact on rollback obligations. As to future rates, insurers may charge anything between the minimum and maximum permissible rate. The Commissioner has fixed the formula for determining both, but has not determined the maximum permissible rate of return for future rates. The maximum rate that insurers will be permitted to charge therefore cannot be determined. Since it is the result, not the methodology that counts, plaintiffs' claims concerning the future rates are unripe. Although the challenge to the future regulations may raise the same issues as the challenges to the rollback rates, these issues will likely be decided in the ongoing state judicial proceedings to determine the rollback obligations.

### 2. Important State Interests

There is no argument over the second requirement of *Younger.* The ongoing administrative proceedings implicate important state interests. *Calfarm,* 48 Cal.3d at 812, 258 Cal.Rptr. 161, 771 P.2d 1247.

### 3. Opportunity to Raise Constitutional Claims

Although plaintiffs may be precluded by proposed regulation § 2464.4 from raising their Takings, Rate Component, First Amendment and Due Process claims in their individual company hearings, plaintiffs may raise such claims during the state judicial review. *Calfarm,* 48 Cal.3d at 825 n. 18, 258 Cal.Rptr. 161, 771 P.2d 1247. In *Dayton,* the United States Supreme Court clarified that "it is sufficient ... that constitutional claims may be raised in state-court judicial review of the administrative

proceeding." 477 U.S. at 629, 106 S.Ct. at 2723. Although the Due Process claim is an attack on the sufficiency of the *procedures* used in the individual company hearings, the Supreme Court has "repeatedly rejected the argument that a constitutional attack on state procedures themselves 'automatically vitiates the adequacy of those procedures for purposes of the *Younger–Huffman* line of cases.'" *Id.* 477 U.S. at 628, 106 S.Ct. at 2723 (quoting *Moore v. Sims,* 442 U.S. 415, 427 n. 10, 99 S.Ct. 2371, 2379 n. 10, 60 L.Ed.2d 994 (1979)). It is sufficient that plaintiffs may raise this claim on judicial review. *Id.* 477 U.S. at 629, 106 S.Ct. at 2723. *Younger* abstention is therefore appropriate as to plaintiffs' Takings, Rate Components, First Amendment and Due Process claims.

■ However, plaintiffs may not have an adequate opportunity to raise their Retaliation claim in the state court review of their rate rollback orders, since the essence of this claim is that insurers will be unfairly dissuaded from challenging their rollback orders. *Younger* abstention is therefore inappropriate as to this claim.

### C. *Pullman* Abstention

In *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Court held that federal courts should abstain from deciding constitutional questions that "touch[ ] a sensitive area of social policy" if the resolution of difficult and unsettled questions of state law could moot the federal constitutional claim. *Id.* 312 U.S. at 498, 61 S.Ct. at 644. By giving state courts the opportunity to interpret state law first, the federal courts can avoid both "needless friction with state policies" and unnecessary constitutional adjudications. *Id.* at 498, 500, 61 S.Ct. at 644, 645.

■ The Ninth Circuit has consistently applied a three-part test for *Pullman* abstention:

(1) The complaint "touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open."

(2) "Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy."

(3) The possibly determinative issue of state law is doubtful.

*Privitera v. California Bd. of Med. Quality Assur.,* 926 F.2d 890, 895 (9th Cir.1991) (quoting *Canton v. Spokane School Dist. No. 81,* 498 F.2d 840, 845 (9th Cir.1974) (quoting *Pullman* )).

### 1. Sensitive Area of State Policy

There is no dispute that plaintiffs' complaints touch a sensitive area of state social policy, satisfying the first part of the *Canton* test. Insurance rates on automobile and other personal lines of insurance affect millions of California citizens. And Prop. 103 was an *initiative* originated and passed by California voters. This first requirement is consistent with *Burford*'s "policy problems of substantial public import," and overlaps *Younger*'s requirement that "important state interests" are implicated.

### 2. Necessity for Determining State Law

Plaintiffs urge that it is not enough that the controversy *may* be resolved by a clarification of state law. Rather, they contend that *Pullman* abstention is appropriate only if it is *necessary* to resolve the state law issues in order to decide the federal constitutional claims. Plaintiffs' sole support for this argument is a statement in *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) that:

> In [*Pullman* ], this Court held that federal courts should abstain from decision when difficult and unsettled questions of state law *must* be resolved before a substantial federal constitutional question can be decided.

*Id.* 467 U.S. at 236, 104 S.Ct. at 2327 (emphasis added).

In this sentence, the Court purported only to restate its holding in *Pullman,* not redefine or narrow it. Plaintiffs seek to elevate one word used by the Court to describe its prior decision into a substantial revision of the decision itself. Neither *Pullman* itself nor *Hawaii Housing* supports plaintiffs' interpretation. The Ninth Circuit has persisted in applying a more lenient test seven years after *Hawaii Housing* was decided. *Privitera,* 926 F.2d at 895.

### 3. What State Law Must Be Unclear

Plaintiffs then argue that while the regulations may be attacked as invalid under certain ambiguous provisions of state law, the regulations *themselves* are not ambiguous. Plaintiffs contend that *Hawaii Housing* limited *Pullman* abstention to cases where the challenged law is itself ambiguous, relying on the Court's conclusion that *Pullman* abstention was unnecessary because the challenged "statutes are not of an uncertain nature and have no reasonable limiting construction." 467 U.S. at 237, 104 S.Ct. at 2327.

However, this interpretation of *Pullman* runs counter to *Pullman* itself. In *Pullman,* the Court declined to resolve a claim that an order of the Texas Railroad Commission violated the Fourteenth Amendment, because it was unclear under Texas law whether the Commission had the authority to issue the order. The order itself was clear. 312 U.S. at 497–500, 61 S.Ct. at 643–645. The Court's conclusion, and its accompanying statement that "abstention is not to be ordered unless the [state] statute is of an uncertain nature, and is obviously susceptible of a limiting construction," *Hawaii Housing,* 467 U.S. at 237, 104 S.Ct. at 2327 (quoting *Zwickler v. Koota,* 389 U.S. 241, 251 n. 14, 88 S.Ct. 391, 397 n. 14, 19 L.Ed.2d 444 (1967)), merely reflects the fact that in *Hawaii Housing, Zwickler,* and several of the cases cited there was *no* uncertain issue of state law, *Harman v. Forssenius,* 380 U.S. 528, 534, 85 S.Ct. 1177, 1181, 14 L.Ed.2d 50 (1965); *Davis v. Mann,* 377 U.S. 678, 690, 84 S.Ct. 1441, 1447, 12 L.Ed.2d 609 (1964); *McNeese v. Board of Educ.,* 373 U.S. 668, 673, 674, 83 S.Ct. 1433, 1436, 1437, 10 L.Ed.2d 622 (1963); *City of Chicago v. Atchison, T. & S.F. R.R. Co.,* 357 U.S. 77, 84, 78 S.Ct. 1063, 1067, 2 L.Ed.2d 1174 (1958), or the law was so uncertain that a limiting construction was practically impossible, *Bag-*

*gett v. Bullitt,* 377 U.S. 360, 378, 84 S.Ct. 1316, 1326, 12 L.Ed.2d 377 (1964) (oath challenged as unconstitutionally vague could not be construed to avoid constitutional issue); while in others, abstention was held *appropriate* because of uncertain issues of state law, *England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 413–14, 84 S.Ct. 461, 463–64, 11 L.Ed.2d 440 (1964) (questionable whether challenged statute applied to appellants); *Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 104–05, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944) (abstention proper until state courts determine nature and application of tax).

Plaintiffs have not cited any authority that, *contra Pullman,* abstention is improper if a constitutional adjudication could be rendered unnecessary by a clarification of an uncertain state law other than the law being challenged. The Ninth Circuit has continued to apply a contrary rule after *Hawaii Housing* was decided, *Bank of Am. Nat'l Trust & Sav. v. Summerland Cty. Water Dist.,* 767 F.2d 544, 547 (9th Cir.1985) (*Pullman* abstention proper because resolution of state law questions may lead to invalidation of challenged ordinance), consonant with *Pullman*'s objective of avoiding federal interference in sensitive matters of social policy unless *"no alternative* to [constitutional] adjudication is open." *Pullman,* 312 U.S. at 498, 61 S.Ct. at 644 (emphasis added).

### 4. State Law Effect on Constitutional Claims

The parties then dispute what effect the state law clarification must have on the constitutional claims in order for *Pullman* abstention to be appropriate. Plaintiffs argue that resolution of the state law issues in their favor must entirely moot the constitutional claims; the Commissioner argues that it is enough that it would present these claims in a different posture.

The Ninth Circuit squarely addressed this issue in *C–Y Dev. Co. v. City of Redlands,* 703 F.2d 375 (9th Cir.1983):

It is true that in many of our prior abstention decisions, deferral to the state courts may have had the potential of mooting all of the federal constitutional issues involved. Moreover, the second of the three *Canton* criteria relied on in our abstention decisions speaks in terms of the constitutional adjudication "plainly" being avoided by a definitive ruling on the state issue. Nevertheless, this does not represent the outer limits of the abstention doctrine. In *Canton* we explained that with regard to the second and third criteria "it is crucial that the uncertainty in the state law be such that construction of it by the state courts might obviate, *or at least delimit,* decision of the federal (constitutional) question." 498 F.2d at 845 (citations omitted) (emphasis added). In none of our cases have we held that the deferral to state court must have the potential of entirely obviating all federal constitutional questions. On the contrary, several cases of our court and of the Supreme Court have indicated that it is enough that the state court determination may obviate, in whole *or in part,* or *alter the nature* of the federal constitutional questions.

. . . .

Although abstention in this case may not obviate the need to decide all the federal constitutional questions, it will substantially reduce the contours of such adjudication and place it in a different posture.

*Id.* at 379–80 (citations omitted, emphasis in original).

A year later, in *Hawaii Housing,* the United States Supreme Court rejected as insufficient the "bare, though unlikely, possibility that state courts *might* render adjudication of the federal question unnecessary." 467 U.S. at 237, 104 S.Ct. at 2327 (emphasis in original). Plaintiffs contend that the Court's rejection of this possibility is equivalent to a requirement that the uncertain issue of state law be dispositive. However, in *Hawaii Housing,* the Court found *Pullman* abstention inappropriate because the statutes in question were clear, not because those statutes would insufficiently impact the constitutional claim. 467 U.S. at 237, 104 S.Ct. at 2327.

The Ninth Circuit reaffirmed the continuing vitality of *C–Y Development* a year after *Hawaii Housing* was decided: "Under *C–Y Development,* the important factor is ... the extent to which [the constitutional issues] can be eliminated *or simplified* by state court proceedings." *Bank of America,* 767 F.2d at 547 (emphasis added). Cases in this district continue to regard *C–Y Development* as settled Ninth Circuit law. *Rooke v. City of Scotts Valley,* 664 F.Supp. 1342, 1343–44 (N.D.Cal. 1987); *Southwest Diversified, Inc. v. City of Brisbane,* 652 F.Supp. 788, 792 (N.D.Cal. 1986).

5. State Law Issues in This Case

    a. The Takings Claim

██ Applying the foregoing analysis, *Pullman* abstention is appropriate on plaintiffs' Takings Claims if there is a reasonable possibility that the rollback rates set by the regulations are too low under *state* law.

Certain plaintiffs in this and pending state court litigation [20] apparently argue that Prop. 103 only authorizes the Commissioner to determine whether rates set by insurers are excessive or inadequate, and that they are therefore entitled to charge any rate within this range. Since the regulations purport to allow insurers to charge only rates at the bottom of this range during the rollback period, plaintiffs' interpretation of Prop. 103, if correct, would change their Takings Claim, since the Commissioner would then be required by statute to approve rates in excess of those contemplated by the regulations. *Pullman* abstention is particularly appropriate on plaintiffs' Takings Claims if Prop. 103 is reasonably susceptible of that interpretation advanced by plaintiffs.

*Calfarm* held that section 1861.05 governs rates during the rollback period. 48 Cal.3d at 823, 258 Cal.Rptr. 161, 771 P.2d 1247. That section states that "[n]o rate shall be approved or remain in effect which is excessive [or] inadequate," which the

California Supreme Court interpreted as "requir[ing] rates within that range which can be described as fair and reasonable and prohibit[ing] approval or maintenance of confiscatory rates." *Id.* at 822–23, 258 Cal. Rptr. 161, 771 P.2d 1247. The court held that

> any insurer who believes the rates set by section 1861.01, subdivision (a) [20% reduction from former rates], are *confiscatory* may file an application with the Insurance Commissioner for approval of a higher rate.... If the commissioner finds the initiative's rate, or some other rate less than the insurer charged, is *fair and reasonable,* the insurer must refund excess premiums collected with interest.

> No insurer, however, will be compelled to charge the [rollback] rates set by the initiative unless it ... is unable to prove that a higher rate is *constitutionally required.*

*Id.* at 825, 258 Cal.Rptr. 161, 771 P.2d 1247 (emphasis added). In essence, plaintiffs argue that while *Calfarm* allows insurers to *apply* for relief only from confiscatory rates during the rollback period, the Commissioner is statutorily required to *approve* applications for higher rates that are anything less than "excessive," even if those higher rates are not constitutionally required. This interpretation of California law is not so inherently unreasonable that the California courts not should be given the first opportunity to pass on it.

This court recognizes that the decision to abstain from adjudicating the Takings Claims under *Pullman* may be contrary to a decision of the Second Circuit. In *Alliance of Am. Insurers v. Cuomo,* 854 F.2d 591 (2d Cir.1988), plaintiffs challenged as confiscatory a freeze on medical malpractice insurance rates. The court held that *Pullman* abstention was inappropriate even though the frozen rates were being challenged in state court as inadequate under a statute prohibiting the setting of insufficient rates. *Id.* at 594, 602. The

---

**20.** *Hartford Steam Boiler Inspection & Ins. Co., et al. v. Garamendi,* No. BC023983 (Los Angeles Superior Ct.); *General Ins. Co. of America, et al. v. Garamendi, et al.,* No. BC 036620 (Los Ange-

les Superior Ct.). Plaintiffs in *General Insurance* are represented by the same attorneys as one plaintiff in this action.

court gave three reasons for holding *Pullman* abstention inappropriate, which have already been discussed by this court above.

### b. The Due Process Claim

■ Plaintiffs in the pending state court litigation argue that they have a right to show that the rates are confiscatory as applied to them in their individual hearings, under Insurance Code sections 1861 *et seq.*, the California Administrative Procedure Act, California Government Code sections 11500 *et seq.*, the California Constitution and the United States Constitution.[21]

It is settled in this Circuit that plaintiffs cannot avoid *Pullman* abstention by pleading only federal claims:

> That [appellant] did not specifically raise the question does not foreclose consideration of the issue as a basis for abstention.... " '[I]t is no answer to the contention that the district court should have abstained, that appellants did not raise their state claims in their complaint. Appellants cannot be allowed to frustrate the policies underlying the doctrine of abstention by this simple expedient.' "

*Santa Fe Land Imp. v. City of Chula Vista*, 596 F.2d 838, 840 (9th Cir.1979) (citations omitted).

However, *Pullman* abstention "is not required for interpretation of parallel state constitutional provisions." *Hawaii Housing*, 467 U.S. at 237 n. 4, 104 S.Ct. at 2327 n. 4. In *Calfarm*, the California Supreme Court held the section of Prop. 103 that "preclude[d] adjustments necessary to achieve the constitutional standard of fair and reasonable rates ... invalid under the due process clauses of the state and federal

constitutions." 48 Cal.3d at 821, 258 Cal. Rptr. 161, 771 P.2d 1247. Since the due process clauses of the state and federal Constitutions are "mirror images" of one another for the purpose of litigating confiscatory rates, *Pullman* abstention is unnecessary in deference to litigation of the state constitutional claim.

*Pullman* abstention is therefore appropriate on plaintiffs' Due Process claims only if the provisions of the California Insurance Code or Administrative Procedure Act can reasonably be construed to require the Commissioner to permit insurers to challenge the rates as confiscatory in their individual hearings.

In *Calfarm*, the California Supreme Court found that the Insurance Code requires the Commissioner to hold hearings on the insurers' applications for exemption from Prop. 103's rate rollbacks in accordance with the Administrative Procedure Act. The court found that these and other "safeguards" met "constitutional standards," but went on to hold that each insurer had a right to demonstrate that a particular rate was confiscatory as applied to it. 48 Cal.3d at 825–26, 258 Cal.Rptr. 161, 771 P.2d 1247. The question here is not whether those hearings provide adequate *procedures* for determining whether a rate is confiscatory as applied, but whether the Commissioner is *required* to entertain that issue in those hearings. Although *Calfarm* did not decide whether insurers must be given an opportunity to challenge the rates in their administrative hearings, or only on judicial review,[22] the holding that they must at some point be given this opportunity was based on constitutional grounds.[23]

---

**21.** *See* n. 19 *infra*.

**22.** The court cannot help but wonder what significance could be attributed to constitutionally adequate procedures that cannot be used to litigate the merits of a claim. *Calfarm* held that "[t]he risk that the rate set by the statute [20 percent less than former rates] is confiscatory as to some insurers from its inception is high enough to require an adequate method for obtaining individualized relief." 48 Cal.3d at 820, 258 Cal.Rptr. 161, 771 P.2d 1247. The regulations adopted by the Commissioner purport to implement, rather than depart from the consti-

tutional standard. It may be that the regulations, unlike the statute, do not pose a "high enough" risk of confiscatory rates to require individual adjudications at the administrative level. This court intimates no opinion on how this question should be resolved, and the issue is not before it on this motion.

**23.** The same dichotomy between the statutory right to a hearing and the constitutional right to challenge rates as confiscatory was apparently recognized by Judge Janavs when she observed that "Insurance Code section 1861.08 require[s] ... adjudicatory hearings.... If the insurers are

Neither the California Supreme Court, the Commissioner, nor the plaintiffs in the state court actions have identified any provisions of the Insurance Code or the Administrative Procedure Act that are reasonably susceptible of an interpretation that would require the Commissioner to admit evidence and entertain arguments at the administrative hearings that the rates are confiscatory as applied. There is therefore no unclear issue of state law that warrants *Pullman* abstention on plaintiffs' Due Process claims.

### D. *Colorado River Abstention*[24]

In *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), a case involving water rights, the Supreme Court held that although the case did not fit within any of the other traditional abstention doctrines, dismissal was appropriate in deference to parallel state court proceedings, based on considerations of "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Id.* 424 U.S. at 817, 96 S.Ct. at 1246 (quoting *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.*, 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952)). The Court cautioned that in

the absence of weightier considerations of constitutional adjudication and state-federal relations, the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention.

*Id.* 424 U.S. at 818, 96 S.Ct. at 1246.

■ The Court identified several factors relevant to determine whether such "exceptional" circumstances exist: (1) whether either court has assumed jurisdiction over a *res;* (2) the relative inconvenience of the forums; (3) the desirability of avoiding piecemeal litigation; and (4) the order in which the state and federal courts acquired jurisdiction. *Id.* at 818, 96 S.Ct. at 1246. In *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Court identified two additional factors, (5) whether state or federal law provides the rule of decision on the merits, and (6) whether the state court proceedings are adequate to protect the parties' rights. *Id.* 460 U.S. at 23–27, 103 S.Ct. at 941–943. *See also, Nakash v. Marciano*, 882 F.2d 1411, 1415 (9th Cir.1989) (listing factors).

Addressing the manner in which this nonexclusive[25] list of factors should be applied, the Court stated that:

No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required.

*Colorado River*, 424 U.S. at 818–19, 96 S.Ct. at 1246–47. In *Moses Cone*, the Court clarified that:

the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case.

460 U.S. at 16, 103 S.Ct. at 937.

■ The Ninth Circuit has recognized a seventh factor, improper forum shopping:

---

provided sufficient opportunity to establish a basis for a variance from the criteria or standards set up by the regulations in a meaningful adjudicatory hearing, both Section 1861.08 and constitutional requirements may well be satisfied." *Hartford Steam Boiler Inspection and Ins. Co. v. Garamendi*, No. BC 023 983 at 5 & n. 1 (Los Angeles Superior Ct. April 8, 1991) (order denying preliminary injunction).

**24.** Although commonly referred to as an "abstention" doctrine, the Supreme Court rejects this vocabulary. *Nakash v. Marciano*, 882 F.2d 1411, 1415 n. 5 (9th Cir.1989).

**25.** In *Colorado River*, the Court "described *some* of the factors relevant to the decision," *Moses Cone*, 460 U.S. at 15, 103 S.Ct. at 936 (emphasis added), which it characterized as "example[s]." *Colorado River*, 424 U.S. at 818, 96 S.Ct. at 1246. *See also, Nakash*, 882 F.2d at 1416.

"Forum shopping weighs in favor of a stay when the party opposing the stay seeks to avoid adverse rulings made by the state court or to gain a tactical advantage from the application of federal court rules." *Travelers Indem. Co. v. Madonna,* 914 F.2d 1364, 1371 (9th Cir.1990). The Commissioner argues that plaintiffs have filed these suits in federal court because state courts have thus far been inhospitable to the insurers' challenges. Indeed, Judge Janavs has consistently held that challenges to the regulations are premature until "there is a final administrative determination on the ultimate issue of rollback liability." [26] The Commissioner argues that:

> Like tag-team wrestlers, the hundreds of insurance companies subject to Proposition 103 have taken turns suing the Commissioner, apportioning legal arguments, coordinating attacks, all under the careful handling of common legal representatives. As a result, a comprehensive regulatory program enacted by the voters has been tied up in a full-Nelson for over three years. Now, as there is finally tangible evidence of progress in implementing the initiative, the companies bring their brawl to federal court, seeking to pin the Commissioner before he can render his administrative decisions.

Insurers doing business in California certainly have a right to challenge any unconstitutional aspects of the rate making process which have been forced on them by the initiative. But the multiple and overlapping assertions of these challenges in state court, before the Commissioner, and in this court causes this court to question those tactics. Numerous insurers are involved in these multiple challenges, some represented by the same law firms. Some challenges are filed in state court and some are filed in federal. The challenges are at the same time identical, separate and overlapping. Some of that appears to be coordinated and calculated (for example, the filing of the two complaints in these actions minutes apart). And most of the significant issues in these two cases are already pending in state court. The net result is to bring this court into an already complex and protracted process of litigation. Is that forum-shopping, or deliberate complexity, or merely the difficulty of the issues?

In keeping with the flexible and pragmatic approach taken to *Colorado River* analysis, the Ninth Circuit has loosened the requirement that the suits pending in state and federal court involve exactly the same parties or the same claims: "exact parallelism ... is not required. It is enough if the two proceedings are 'substantially similar.'" *Nakash v. Marciano,* 882 F.2d at 1416. This court agrees that "if ever there were an exceptional case, this must be it," and that the policy of "wise judicial administration" underlying *Colorado River* compels abstention.[27]

The Ninth Circuit has held that "[t]he *Colorado River* test ... does not apply where the Declaratory Judgments Act, 28 U.S.C. § 2201, is involved." *Chamberlain v. Allstate Ins. Co.,* 931 F.2d 1361, 1366 (9th Cir.1991). Plaintiffs argue that because they have requested declaratory as well as injunctive relief, *Colorado River* is inapplicable to their cases *in toto.* This court does not read *Chamberlain* so broadly. In *Chamberlain,* an insured sued his insurer in state court alleging a bad faith refusal to defend him in an underlying suit. The insured filed a second suit in state court. The insurer removed the first suit to federal court, and filed a counterclaim seeking a declaration of no coverage. The district court granted summary judgment for the insurer on both the bad faith claim and the counterclaim. On appeal, the Ninth Circuit held that where parallel actions for declaratory relief are pending in

---

**26.** *20th Century Ins. Co., et al. v. Garamendi,* JCCP 2419 [San Francisco Superior Ct. No. 938 470] at 8 (Los Angeles Superior Ct. Dec. 13, 1991) (order dismissing petition for writ of mandate), and prior cases cited therein.

**27.** In the context of the state court's judicial review of the decisions of the Commissioner, it is also appropriate that that court be the one to determine whether plaintiffs have a Retaliation Claim; that is, whether the Commissioner is really retaliating against them, or whether they are simply caught in a procedural morass which is partially of their own creation.

both state and federal courts, the decision to exercise jurisdiction should not be analyzed under *Colorado River*, but under the related doctrine of *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942). *Accord, Continental Casualty Co. v. Robsac Indus.*, 947 F.2d 1367 (9th Cir.1991).

> The *Brillhart* doctrine
>
> stems from the fact that by its express terms the Declaratory Judgments Act makes the granting of declaratory relief discretionary. 28 U.S.C. § 2201(a) ("any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration").

*Continental Casualty*, 947 F.2d 1367, 1369 (9th Cir.1991) (emphasis added).

Because the relief sought is discretionary, the requirements for abstention under *Brillhart* represent a downward departure from the standards of *Colorado River*, which applies in the ordinary case where the district court has the "virtually unflagging obligation" to exercise its jurisdiction. *Chamberlain*, 931 F.2d at 1366 (quoting *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246). *Brillhart* creates "a *presumption*" that "when a party requests declaratory relief in federal court and a suit is pending in state court presenting the same state law issues, ... the entire suit should be heard in state court." *Chamberlain*, 931 F.2d at 1366–67 (emphasis added). If the strictures of *Colorado River* are satisfied, then *a fortiori*, the requirements under *Brillhart* should be met.

In this case, plaintiffs seek a declaration that the regulations adopted by the Commissioner are unconstitutional, and an injunction against their use or enforcement. The court would have to determine that the regulations are unconstitutional in order to grant injunctive relief. The identical issues are raised in both declaratory and injunctive relief. It would elevate form over substance for this court to apply two different tests to determine whether it should exercise jurisdiction over what are essentially indivisible claims for relief. While

district courts ordinarily have discretion to grant declaratory relief, in this case determining whether plaintiffs are entitled to that relief is a necessary incident of adjudicating the merits of their claims.

The Supreme Court has left open the question of "whether a dismissal or a stay should ordinarily be the preferred course of action when a district court finds that *Colorado River* counsels in favor of deferring to a parallel state-court suit." *Moses Cone*, 460 U.S. at 28, 103 S.Ct. at 943; *see also, Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 570 n. 21, 103 S.Ct. 3201, 3215 n. 21, 77 L.Ed.2d 837 (1983). In *Attwood v. Mendocino Coast Dist. Hosp.*, 886 F.2d 241, 242–46 (9th Cir.1989), the Ninth Circuit held that a stay of the federal proceedings, rather than a dismissal, was appropriate. The court's reason for that distinction in *Attwood*, to protect the plaintiff from being time-barred if she returned to federal court, is not present here.

## VIII.

Having examined each of the trees, it is appropriate for the court to stand back and take a look at the forest; or more specifically, at the boundary line between the state and the federal preserves.

This litigation arises from an initiative originated and passed by the voters of California. Its implementation requires regulations to be adopted by the California Insurance Commissioner, which regulations are still in the process of being defined. It also requires hearings by the Commissioner. The issues here are already being litigated in California state court, and include questions of state law. The ultimate determination to be made is what premiums insurers may charge to the citizens of the state, and what premiums they are required to pay back to the state's citizens. And insurance is an industry whose regulation has generally been committed by Congress to the states.

That broad view of the forest looks like a state preserve. It is therefore appropriate to let state law and state procedures be applied before a federal court interjects itself. An aggrieved party can complain

about violations of federal law or the federal constitution, either in state court or by petitioning the United States Supreme Court for writ of certiorari. Perhaps the aggrieved parties can return to this court if the ripeness and abstention roads through the forest have been charted. After the issues have been addressed in state court, many of the claims may be resolved, and at least a more complete record will be developed. At that point, it may be appropriate for a federal court to address any outstanding issues over which it has jurisdiction. But that is for another day.

IT IS THEREFORE ORDERED that defendant's motion to dismiss is granted, and a JUDGMENT of dismissal is hereby entered in favor of defendant and against plaintiffs.